UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------X
RICHARD ORTIZ,

                Plaintiff,

                                17 Civ. 4751 (RWS)

   - against -

                                OPINION

NANCY A. BERRYHILL,
Acting Commissioner of Social Security,

                Defendant.
-------------------------------------------X

A P P E A R A N C E S:



            Attorney for Plaintiff
            MANHATTAN LEGAL SERVICES
            40 Worth Street, 6th Floor
            New York, NY 10013
            By: William D. Kaplan, Esq.

            Attorney for Defendant
            SOCIAL SECURITY ADMINISTRATION
            Special Assistant United States Attorney
            Office of General Counsel
            26 Federal Plaza, Room 3902
            New York, NY 10278
            By:  Vernon Norwood, Esq.

**Sweet, D.J.**

Plaintiff Richard Ortiz ("Ortiz" or the "Plaintiff") brings this action pursuant to Section 205(g) of the Social Security Act, 42 U.S.C. § 402, *et seq.* (the "Act"), challenging the determination of Defendant Nancy Berryhill, Acting Commissioner of Social Security ("Berryhill," the "Defendant," or the "Commissioner"), to deny his application to the Social Security Administration ("SSA") for monthly disability insurance benefits ("DIB") and Supplemental Security Income ("SSI") benefits. Both parties have moved for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure. As set forth below, the Plaintiff's motion is granted, and the Commissioner's cross-motion is denied. The action is remanded to the ALJ for further development of the administrative record in accordance with this opinion.

## I.    **Prior Proceedings**

Plaintiff commenced this action because the Commissioner denied his SSI application, which he filed on October 3, 2013, alleging disability involving discomfort with

social interactions. *See* Tr. 216-24, 127-28.[1] The State agency responsible for making disability determinations on behalf of the Commissioner initially denied Plaintiff's SSI Application. Tr. 153-68. Plaintiff then requested a hearing before an administrative law judge ("ALJ"). Tr. 169-71. Plaintiff, represented by counsel, appeared and testified at a hearing before ALJ Lucian Vecchio, held on February 20, 2015. Tr. 120-52. Dr. Edward Halperin ("Halperin"), a psychiatric expert, and Dr. Gerald Belchick ("Belchick"), a vocational expert, also appeared and testified. Tr. 130-51. ALJ Vecchio considered Plaintiff's disability claim *de novo*, and on May 19, 2015, found that Plaintiff retained the residual functional capacity ("RFC") to perform work that exists in significant numbers in the national economy, and as such, that Plaintiff was not disabled. Tr. 106-16. On July 14, 2015, Plaintiff timely requested review of the ALJ's decision from the Appeals Council. In April 2017, the Appeals Council denied Plaintiff's request for review of the ALJ's decision, thus rendering the ALJ's decision the Commissioner's final decision. Tr. 5, 102.

Plaintiff timely commenced this action on June 22, 2017, *see* Compl., ECF Dkt. No. 1, and Plaintiff and Commissioner

---

[1]	References to "Tr." are to the administrative record filed by the Commissioner (the "Administrative Record").

cross-moved for judgment on the pleadings on December 22, 2017 and March 6, 2018, respectively. *See id.* Dkt. Nos. 11, 18. The cross-motions were heard and marked fully submitted on April 4, 2018.

The period at issue here is from the filing date of Plaintiff's SSI application, October 3, 2013, through the Commissioner's May 19, 2015 final decision.[2]

## II. **The Administrative Record**

The Social Security Administrative Record, *see* ECF Dkt. No. 10, sets forth the following history.

Ortiz was born in 1983, and left school in the fifth grade. Tr. 132. Plaintiff was 30 years of age on the date of his SSI filing. Tr. 123. He has no past relevant work experience. Tr. 235.

---

[2]     SSI is not payable before the month after the month in which the SSI application was filed. 20 C.F.R. § 416.335.

3

a. Evidence Submitted to the ALJ Before His Decision

**a. Dr. Ted Woods, M.D., Consultative Physician**

Dr. Ted Woods ("Dr. Woods") examined Plaintiff on
November 7, 2013 and assessed no limitations in sitting,
standing, pushing, pulling, climbing, or carrying heavy objects.
Tr. 390. Dr. Woods observed that Plaintiff's gait and stance
were normal. Tr. 389. Plaintiff's squat was full. Tr. 389. He
did not exhibit difficulty in changing for the examination,
getting on and off the examination table, or rising from a
seated position. Tr. 389. Plaintiff demonstrated full muscle
strength and a full range of motion as well as normal reflexes
and sensations throughout his arms and legs. Tr. 390. His hand
and finger dexterity were intact. Plaintiff demonstrated full
grip strength, bilaterally. Tr. 390. Dr. Woods diagnosed
Plaintiff with a history of hypertension and anemia. Tr. 389-90.

**b. Dr. Haruyo Fujiwaki, Ph.D, Consultative Psychologist**

Dr. Haruyo Fujiwaki ("Dr. Fujiwaki") evaluated
Plaintiff on November 7, 2013, and assessed that Plaintiff's
"manner of relating, social skills, and overall presentation
were poor," and that "he was withdrawn, and it took time for him
to respond to questions posed to him." Tr. 384. Though eye

4

contact was established, it was not maintained consistently. Tr. 384. Affect was restricted in range and mood was mildly dysthymic. Tr. 34. Insight and judgment were fair. Tr. 384.

Dr. Fujiwaki assessed that Plaintiff could understand simple directions and instructions; perform simple tasks, independently; maintain attention and concentration; maintain a regular schedule in a supportive environment; learn new tasks; perform certain complex tasks with supervision, due to lack of work experience; and, make appropriate decisions. Tr. 385. Dr. Fujiwaki also assessed that Plaintiff had a marked limitation in relating adequately with others and a moderate-to-marked limitation in dealing appropriately with stress. Tr. 385.

Plaintiff told Dr. Fujiwaki that he attended school up to the fifth grade and attended regular education classes as well as speech therapy. Tr. 383. Plaintiff reported that he stopped attending school because he was not learning anything. He also reported that he lives with his mother, and has never had to work because he has no responsibilities. Tr. 383. Plaintiff told Dr. Fujiwaki that his mother did all the household chores because he did not know how to do them. Tr. 385. He also stated that he did not socialize and reported that he could independently use public transportation and/or manage

5

his money. Plaintiff further stated that he spent his days sitting around the house. Tr. 385. He was not currently receiving any psychiatric treatment, had no history of psychiatric hospitalization, and last received outpatient psychiatric treatment when he was five years old. Tr. 383. He complained of sleep difficulties; loss of appetite, energy, and usual interest; as well as worrying about what he would do the next day. He also complained of difficulty getting along with others. Plaintiff stated that he was comfortable being alone and quiet. Tr. 383.

Dr. Fujiwaki observed that Plaintiff was cooperative, but withdrawn. Tr. 384. Plaintiff's manner of relating, social skills, and overall presentation were poor. Tr. 384. His speech and language skills were adequate. Tr. 384. His thought processes were coherent and goal directed with no paranoia, hallucinations, or delusions. Tr. 384. Plaintiff's mood was mildly dysthymic and his affect was restricted. Tr. 384. He was fully oriented and his sensorium was clear. His attention and concentration were intact. Tr. 384.

Plaintiff's recent and remote memory skills were intact. Tr. 384. His intellectual functioning was within the average range. Tr. 385. Plaintiff's general fund of information

was appropriate for his experience. Tr. 385. His insight and judgment were fair. Tr. 385. Dr. Fujiwaki assessed depressive disorder, not otherwise specified ("NOS"), and anxiety disorder, NOS. Tr. 385. Dr. Fujiwaki recommended psychological treatment and vocational training. Tr. 386.

## b. **Dr. T. Harding, Ph.D., State Agency Psychological Consultant**

Dr. T. Harding ("Dr. Harding") reviewed the evidence of record on November 20, 2013 and completed a Psychiatric Review Technique Form ("PRTF") and a mental RFC assessment. Tr. 156-60. On the PRTF, Dr. Harding assessed a mild restriction in performing the activities of daily living; moderate difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence, or pace; and, no episodes of decompensation. Tr. 157. On the mental RFC assessment, Dr. Harding assessed no significant limitations in understanding, remembering, and carrying out very short and simple instructions; maintaining attention and concentration for extended periods; performing activities within a schedule; sustaining an ordinary routine; working in coordination with others; making simple work-related decisions; completing a normal workday and work week without interruptions from

7

psychologically-based symptoms; and maintaining socially appropriate behavior. Tr. 159-60. Dr. Harding also assessed that Plaintiff had no limitations in adaptation. Tr. 160. The doctor assessed moderate limitations in interacting appropriately with the general public; asking simple questions or requesting assistance; accepting instructions and responding appropriately to criticism from supervisors; and getting along with coworkers and peers. Tr. 160. Dr. Harding opined that Plaintiff could perform semiskilled-to-skilled work in a setting where he would not work closely with others. Tr. 157.

**c. Joyce Racz, LCSWR, Social Worker**

Social Worker Joyce Racz ("SW Racz") completed an assessment of Plaintiff's mental/intellectual functional limitations on February 19, 2015. Tr. 402-05. SW Racz stated that she had met with Plaintiff three times. Tr. 402. SW Racz opined that Plaintiff exhibited marked difficulties in paying bills, shopping, cooking, using public transportation, and independently initiating and/or participating in activities. Tr. 402. His mother took care of the household chores and accompanied him to his medical appointments. Tr. 402. SW Racz observed that Plaintiff exhibited marked difficulties in social functioning, noting particular difficulties in communicating

clearly and effectively; displaying awareness of the feelings of others; exhibiting social maturity; establishing interpersonal relationships; and interacting and actively participating in group activities. Tr. 402. Plaintiff was socially isolated and withdrawn, lacked spontaneous speech, and maintained poor eye contact. Tr. 403. She opined that Plaintiff would experience repeated episodes of deterioration or decompensation in work or work-like settings due to his poor decision-making, inability to adapt to changing demands of context, and withdrawal from situations. Tr. 403.

SW Racz further opined that Plaintiff would have difficulty holding a job, maintaining attention for two hours, sustaining an ordinary work routine without special supervision, making simple work-related decisions, and asking simple questions or requesting assistance. Tr. 404. She concluded that Plaintiff's functional limitations would last for at least 12 months. Tr. 405.

**d. Dr. Edward Halperin, M.D., Psychiatric Expert**

At the hearing on February 20, 2015, Dr. Edward Halperin ("Dr. Halperin") testified as a medical expert. Dr. Halperin identified Plaintiff's isolation and extraordinary

9

passivity, and described Plaintiff's passivity as a style of interacting "one would not expect of a 31 year old or even a 21 year old or even an 11 year old." Tr. 135-36. Dr. Halperin described Plaintiff as a "pseudo retarded" individual, and that Plaintiff was not specifically depressed but rather extraordinarily passive. Tr. 136. Dr. Halperin testified that Plaintiff's social isolation and pseudo retardation were impairments that, in his opinion, neither met nor medically equaled any impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. Tr. 136-37. Dr. Halperin advanced the idea that Plaintiff's symptoms of isolation, passivity, and avoidance were egosyntonic, *i.e.*, of Plaintiff's own volition. Tr. 137. For the degree of Plaintiff's limitation in activities of daily living, Dr. Halperin testified that these would be seen as markedly limited, but then stated they were "non-ratable" based on his feeling that they were egosyntonic.[3] Tr. 137.

As for Plaintiff's degree of limitation in social functioning, Dr. Halperin opined that Plaintiff had mild

[3]     A level of functioning that is "non-ratable" implies "extreme limitation," which is defined by the SSA as "not able to function in this area independently, appropriately, effectively, and on a sustained basis." 20 C.F.R. § 404, App. 1, § 12.00.F.2.e. "Marked limitation" is defined as "functioning in this area independently, appropriately, effectively, and on a sustained basis is seriously limited." *Id.*

10

limitation, and then classified it as "non-ratable." Tr. 138.
Dr. Halperin concluded his testimony by recommending that
Plaintiff should have more vigorous psychotherapy and engage in
vocational training. Tr. 138.

**e. Educational, Testimonial and Other Non-Medical Evidence**

Ortiz's problems with extreme social discomfort,
depressed mood, isolation, and inhibited speech are documented
as early as age six in his education records.

A May 11, 1989 speech language evaluation by speech
language pathologist Latha Krishnaswamy, M.S. ("Krishnaswamy"),
reported that Plaintiff had a severe phonological disorder and
mild to moderate receptive and expressive language delay. Tr.
291-94. It was noted that Plaintiff's kindergarten teacher at
P.S. 108 had difficulty understanding him. Tr. 291.

An evaluation report by a school psychologist dated
February 2, 1990 described Plaintiff as "a sweet, shy child."
Tr. 321. It noted that Plaintiff had definite articulation
deficits and that he hesitated to verbalize anything as he was
very self-conscious of his inability to speak clearly. Tr. 321.
Specifically, Plaintiff mispronounced and garbled his speech,

11

was not a spontaneous talker, and any speaking consisted of the use of single words. Tr. 321. Plaintiff had no decoding skills and was a non-reader. Tr. 322. He was also not able to recognize any of the sight words shown on the Brigance Word Placement List, except for the word "a."[4] The report also noted that multiple sessions were needed because Plaintiff was typically lethargic, sleepy, and unresponsive, and he often yawned and slouched in his chair. Tr. 325. Throughout the testing, four related factors were noted: sadness, tiredness, misarticulation, and the inhibition of speech. Tr. 326.

School psychologist Suzanne Tannenbaum ("Tannenbaum") conducted a Confidential Psychological Report on January 26, 1993, in which she assessed Plaintiff's intellectual functioning to be in the low average range with borderline verbal IQ and low average non-verbal IQ. Tr. 299-300. Tannenbaum noted that Plaintiff was in regular education with speech and language services. Tr. 299. On the Wechsler standardized test, Plaintiff scored 79 in verbal IQ, 86 in Performance IQ, and 81 in Full Scale IQ. Tr. 299. Tannebaum remarked that Plaintiff's speech deficits were significantly interfering with his ability to communicate, and although Plaintiff did not seem to be

---

[4]     Brigance Word Placement is an assessment tool used by schools for students in pre-K, kindergarten, and first grade.

experiencing any significant emotional problems, he was showing signs of anxiety and feelings of inadequacy. Tr. 302. Tannenbaum recommended Plaintiff participate in speech-language services and counseling to help with communication and interpersonal skills. Tr. 302.

At the February 2015 ALJ hearing, Plaintiff testified that he was disabled because he was very uncomfortable being around others. *See* Tr. 124, 129. Plaintiff testified that he lived with his mother and did not do any household chores. Tr. 126. He claimed that he could not use public transportation independently, but he did know how, and might be able to independently travel by taxi, inasmuch as he took taxis accompanied by his mother to attend his medical appointments. *See* Tr. 126-27, 134. Plaintiff spent his days at home watching television, and claimed that he had no friends and no hobbies. *See* Tr. 127-29. He did not go outdoors, because he did not like to and had no reason to be outdoors. *See* Tr. 127, 129. He has not been around others in a long time, because they made him nervous and he did not want to be around them. *See* Tr. 127-29. Plaintiff testified that he had no future plans. Tr. 129. Plaintiff testified that he sought a psychiatric evaluation at the suggestion of his SSI lawyer in March 2014. Tr. 135; *see also* Tr. 434.

13

At the hearing, the ALJ asked Dr. Belchick, an impartial vocational expert, to consider a hypothetical individual of the same age as Plaintiff and with the same educational background and work experience as Plaintiff. Tr. 144. The hypothetical individual could perform no more than medium work with support and/or assistance. Tr. 145. The individual was limited to simple, repetitive tasks, due to his stress intolerance and lack of work experience. Tr. 145. He could perform neither high production nor quota work. Tr. 145. The individual was further limited to little interaction with co-workers, supervisors, or the public. Tr. 145-46. Dr. Blechick opined that such a hypothetical individual could perform several occupations. Tr. 146-48. Dr. Belchick cited kitchen helper (502,000 jobs nationally; 26,000 regionally), cleaner (895,000 jobs nationally; 47,000 regionally), and laundry worker (199,000 jobs nationally; 15,000 regionally) as examples of such unskilled occupations listed in the U.S. Department of Labor's *Dictionary of Occupational Titles* ("DOT") (4th ed. rev. 1991) that the hypothetical individual could perform. Tr. 146-48. *See* DOT Job Nos. 318.687-010, 323.687-014, and 361.684-014, respectively.

f. Evidence Submitted to the Appeals Council After the ALJ's
Decision

**a. Dr. Kotlier, M.D., Psychiatrist**


Metropolitan Hospital Center ("MHC") treated Plaintiff
for depression from March 2014 through July 2016. Tr. 44-74,
406-37, 512-37. Dr. Susan Kotlier ("Dr. Kotlier"), a
psychiatrist, counseled Plaintiff from March 17 through May 2,
2014. Tr. 423-37. At the initial visit on March 17, Plaintiff
told Dr. Kotlier that his appetite was normal, but he liked to
eat a lot of junk food; he slept for five hours per night;
isolated himself in his apartment; and, enjoyed watching
television and playing video games. Tr. 433. Plaintiff sought
the evaluation because his SSI lawyer told him to. Tr. 434. Upon
mental status examination, Dr. Kotlier observed Plaintiff was
calm and cooperative, with avoidant eye contact. Tr. 435.
Plaintiff's speech was slow. His affect was constricted and
inappropriate to content. He denied perceptual disturbances as
well as suicidal, homicidal, and/or paranoid ideation. Tr. 435.
Plaintiff was alert and fully oriented, with limited cognitive
functioning. Tr. 435. His impulse control, insight, and judgment
were good. Tr. 435. On the DSM-IV multiaxial scale, Dr. Kotlier
assessed depressive disorder, NOS, ruled out autism spectrum
disorder on Axis I; and, a global assessment of functioning

15

(GAF) score of 65 on Axis V. Tr. 435. She prescribed Wellbrutin.
Tr. 435. On March 31, 2014, Plaintiff reported that while taking
Wellbutrin he felt better, his sleep was improved, and wanted to
leave his house. Tr. 430. However, he stopped taking Wellbutrin
due to back and leg tremors. Tr. 430. Dr. Kotlier observed that
Plaintiff was more relaxed, but his eye contact was still poor.
Tr. 431. She prescribed a lower dose of Wellbutrin. Tr. 431. At
an April 4 follow-up visit, Plaintiff reported no adverse
effects from Wellbutrin. Tr. 426.

### b. Dr. Leon, M.D., Psychiatrist

Dr. Carmen Leon ("Dr. Leon"), a psychiatrist, provided
medication management from July 2014 through July 2016. *See* Tr.
44-55, 414-20, 513-19, 527-28, 536-37. In July and September
2014, as well as January, March, and June 2015, Dr. Leon
diagnosed Plaintiff with depressive disorder. *See* Tr. 418, 421,
519, 528. In October 2014, November 2014, and August 2015, as
well as February, April, July, and August 2016, Dr. Leon
diagnosed unspecified mood affective disorder. *See* Tr. 45, 48,
51, 411, 414, 513, 536. From May 2014 through March 2015, Dr.
Leon prescribed Wellbutrin. *See* Tr. 414, 417, 420, 516, 519,
527, 536. In January 2015, Dr. Leon recommended vocational
training. Tr. 527. In June 2015, Dr. Leon prescribed Remeron.

16

Tr. 516. In August 2015, Plaintiff reported that he stopped

taking Remeron, and Dr. Leon prescribed Seroquel, a mood

stabilizer, which was renewed in February 2016. *See* Tr. 52, 513.

In April 2016, Plaintiff reported that he was "OK," but had

stopped taking his medication due to its adverse side effects.

Tr. 48. Dr. Leon noted that he prescribed Plaintiff's medication

"at very low doses." Tr. 48. In July 2016, Plaintiff reported "I

don't need medication" and Dr. Leon discharged him. Tr. 45.


### c. SW Racz


SW Racz provided psychiatric therapy in October,

November, and December 2014, March and November 2015, and

February 2016. *See* Tr. 54-55, 408-12, 530-34, 522-25. SW Racz

consistently observed that Plaintiff was sad, withdrawn, and

made poor eye contact, but was alert and cooperative. *See* Tr.

408, 411, 522, 524. Plaintiff's mood fluctuated between

dysthymic and calm, with constricted affect and intact thought

process; and he denied perceptual disturbances. *See* Tr. 408,

411, 522, 524. SW Racz's diagnoses fluctuated between depressive

disorder, NOS and unspecified mood affective disorder. *See* Tr.

54, 408, 522, 524. In February 2016, Plaintiff told SW Racz that

he was not interested in psychiatric therapy. Tr. 54.

g. The ALJ's Decision

Upon review of the medical and non-medical evidence, the ALJ determined that Plaintiff was not disabled because he retained the RFC to perform work that exists in significant numbers in the national economy. Tr. 106-16. In reaching this determination, the ALJ applied the Commissioner's five-step sequential evaluation process for determining disability. *See* 20 C.F.R. § 416.920. At the first step, the ALJ found that Plaintiff had not engaged in substantial gainful activity since October 3, 2013, his SSI application date. *See* Tr. 108; 20 C.F.R. § 416.920(b). At the second step, the ALJ found that Plaintiff's anxiety/social withdrawal disorder and mood disorder were severe impairments. *See* Tr. 108-09; 20 C.F.R. § 416.920(d). At step three, the ALJ found that Plaintiff's impairments, whether considered singly or in combination, neither met nor medically equaled any listed impairment. *See* Tr. 109-12; 20 C.F.R. § 416.920(d); *see generally* 20 C.F.R. Part 404, Subpart P, Appendix 1, (the Listings). After step three, but prior to step four, the ALJ determined that Plaintiff retained the RFC to perform medium work limited to simple, repetitive work tasks, no high volume production or quota work, and little interaction with co-workers, supervisors, and the general public. *See* Tr. 112-14; 20 C.F.R. §§ 416.920(e), 416.967(c). At step four, the

18

ALJ found that Plaintiff had no past relevant work experience. *See* Tr. 115; 20 C.F.R. 416.920(f). At the fifth step, the ALJ considered Plaintiff's vocational factors and RFC and relied on testimony from the vocational expert to find that he could make a successful adjustment to work existing in significant numbers in the national economy, including work as a kitchen helper, cleaner, and laundry worker. *See* Tr. 115-16; 20 C.F.R. § 416.920(g). Thus, the ALJ concluded that Plaintiff was not disabled within the framework of Medical-Vocational Rule 203.25, set forth at 20 C.F.R. Part 404, Subpart P, Appendix 2, and denied his SSI claim. Tr. 113.

## III. **The Applicable Standard**

### a. Review of the Commissioner's Decision

"In reviewing a final decision of the SSA, this Court is limited to determining whether the SSA's conclusions were supported by substantial evidence in the record and were based on a correct legal standard." *Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir. 2012) (internal quotation marks and citation omitted); *see also* 42 U.S.C. § 405(g). "Substantial evidence" must be "more than a mere scintilla. It means such relevant information as a reasonable mind might accept as adequate to support a conclusion." *Talavera*, 697 F.3d at 151 (quoting

*Richardson v. Perales*, 402 U.S. 389, 401 (1971)). When determining whether the agency's findings were supported by substantial evidence, "the reviewing court is required to examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn." *Id.* (internal quotation marks omitted) (quoting *Mongeur v. Heckler*, 722 F.3d 1033, 1038 (2d Cir. 1983) (per curiam)).

"Substantial evidence" is a "very deferential standard of review—even more so than the 'clearly erroneous' standard." *Brault v. Soc. Sec. Admin., Comm'r*, 683 F.3d 443, 448 (2d Cir. 2012) (citation omitted). While the ALJ's decision needs to contain enough information to "glean [the ALJ's] rationale," it is not required to "have mentioned every item of testimony presented to him or have explained why he considered particular evidence unpersuasive or insufficient to lead him to a conclusion of disability." *Mongeur*, 722 F.2d at 1040 (citations omitted). "[O]nce an ALJ finds facts," this Court can "reject those facts only if a reasonable factfinder would *have to* conclude otherwise." *Id.* (internal quotation marks and citation omitted) (emphasis in original). It is not for this Court to "substitute its own judgment for that of the [Commissioner]," even if it might justifiably have reached a different result upon *de novo* review." *Jones v. Sullivan*, 949 F.2d 57, 59 (2d

Cir. 1991) (quoting *Valente v. Sec'y of Health & Human Servs.*, 733 F.2d 1037, 1041 (2d Cir. 1984)).

## b. Standard Of Disability

In order to establish a disability within the meaning of the Act, a claimant must demonstrate the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. § 423(d)(1)(A). Under the Act, it is not sufficient that the claimant establish the mere presence of a disease or impairment. Rather, he must show that the disease or impairment has caused functional limitations that preclude him from engaging in any substantial gainful activity. *Rivera v. Harris*, 623 F.2d 212, 215-16 (2d Cir. 1980); *Coleman v. Shalala*, 895 F. Supp. 50, 53 (S.D.N.Y. 1995).

Congress has established the type of evidence necessary to prove the existence of a disabling impairment by defining a physical or mental impairment as "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable

clinical and laboratory diagnostic techniques." 42 U.S.C. §
423(d)(3). The statute further provides that an individual will
be determined to have a disability "only if his physical or
mental impairment or impairments are of such severity that he is
not only unable to do his previous work but cannot, considering
his age, education, and work experience, engage in any other
kind of substantial gainful work which exists in the national
economy." 42 U.S.C. § 423(d)(2)(A).

To determine disability, the Commissioner uses a five-
step sequential evaluation process. 20 C.F.R. § 404.1520. If a
finding of disability or non-disability can be made at any point
in the sequential analysis, the Commissioner will not review the
claim further. 20 C.F.R. § 404.1520(a); *Williams v. Apfel*, 204
F.3d 48, 48-49 (2d Cir. 1999).

At step one, the Commissioner considers whether the
claimant is currently engaged in substantial gainful activity.
20 C.F.R. § 404.1520(b). If the claimant is not engaged in
substantial gainful activity, the analysis moves to step two
where the Commissioner considers whether the claimant has a
"severe" impairment or combination of impairments that
significantly limit his physical or mental ability to do basic

work activities. 20 C.F.R. §§ 404.1520(c), 404.1521; *Bowen v. Yuckert*, 482 U.S. 137 (1987).

If a severe impairment or combination of impairments is present, at step three the Commissioner considers whether the claimant's impairment meets or equals the criteria in Appendix 1 to 20 C.F.R. Part 404, Subpart P. *See* 20 C.F.R. § 404.1520(d). If the claimant does not have a listed impairment, the Commissioner will make a finding regarding the claimant's RFC, *i.e.,* what a claimant can do despite his impairments and related symptoms. 20 C.F.R. §§ 404.1520(e), 404.1545.

The Commissioner then uses the RFC finding at the fourth and fifth steps of the sequential evaluation. *Id.* At the fourth step, the Commissioner determines whether the claimant has the RFC to perform his past relevant work. 20 C.F.R. § 404.1520(f). The claimant bears the burden of proving that he cannot return to his former type of work. *See Melville v. Apfel*, 198 F.3d 45, 51 (2d Cir. 1999). If the claimant is unable to perform any work he has done in the past, the Commissioner considers his RFC along with his age, education, and past work experience to determine if he can do other substantial gainful activity in the national economy. 20 C.F.R. § 404.1520(g). If a claimant cannot do other work, the claim will be granted. *Id.*

**IV. The Plaintiff's Motion for Judgment on the Pleadings Is Granted, and the Case is Remanded to the ALJ**

a. The ALJ Failed to Adequately Develop the Record

"An applicant for disability payments must show that his impairment is of such severity that he cannot perform his previous work or 'engage in any other kind of substantial gainful work which exists in the national economy.'" *Echevarria v. Sec'y of Health & Human Servs.*, 685 F.2d 751, 755 (2d Cir. 1982) (citing 42 U.S.C. § 1382c(a)(3)(B)). In order to evaluate whether the Secretary's conclusions on the issue are "supported by substantial evidence," which is the relevant test on such an inquiry, *see* 42 U.S.C. § 1383(c)(3), "we must first satisfy ourselves that the claimant has had 'a full hearing under the Secretary's regulations and in accordance with the beneficent purposes of the Act.'" *Echevarria*, 685 F.2d at 755 (citing *Gold v. Sec'y of HEW*, 463 F.2d 38, 43 (2d Cir. 1972)). Absent this, remand to the ALJ for such a full consideration is warranted. *Id.* at 757.

Critically, "[t]he ALJ has an obligation to develop the record in light of the non-adversarial nature of the benefits proceedings, regardless of whether the claimant is represented by counsel." *Shaw v. Chater*, 221 F.3d 126, 131 (2d

24

Cir. 2000) (citation omitted); *see also Sims v. Apfel*, 530 U.S. 103, 111 (2000) ("The ALJ's duty is to investigate the facts and develop the arguments both for and against granting benefits."). The "complete record" that the ALJ has an affirmative duty to develop consists of "objective medical evidence[5] as well as any testimony concerning an applicant's impairment(s), restrictions, daily activities, efforts to work, or any other relevant considerations," *Batista v. Chater*, 972 F. Supp. 211, 218 (S.D.N.Y. 1997) (citing 20 C.F.R. § 404.1512(b)(3) (1997)), as well as "psychiatric evidence where there exists some indication that the plaintiff has psychiatric problems." *See id.* (citing *Pascual v. Sullivan*, 715 F. Supp. 1268, 1271 (S.D.N.Y. 1989); *see also id.* (finding that plaintiff evidenced some psychiatric problems sufficient to trigger the ALJ's duty to develop

---

[5]     The ALJ's duty to develop medical records is as follows: "[b]efore we make a determination that you are not disabled, we will develop your complete medical history . . . [and] will make every reasonable effort to help you get medical reports from your own medical sources when you give us permission to request the reports." *Perez v. Chater*, 77 F.3d 41, 47 (2d Cir. 1996) (citing 20 C.F.R. § 404.1512(d)). The regulations also state that, "[w]hen the evidence we receive from your treating physician . . . or other medical source is inadequate for us to determine whether you are disabled, . . . [w]e will first recontact your treating physician . . . or other medical source to determine whether the additional information we need is readily available." *Id.*, 77 F.3d at 47 (citing 20 C.F.R. § 404.1512(e)); *see also Shaw*, 221 F.3d at 134 (internal alteration omitted) (noting that it is "the ALJ's duty to seek additional information from the treating physician *sua sponte*.").

25

psychiatric evidence as demonstrated by the recommendations of two of his doctors, the diagnosis of depression by plaintiff's treating physician, a questionnaire completed by another of plaintiff's doctors and the fact that plaintiff had been undergoing psychotherapy and taking an antidepressant). Where such a deeper dive into plaintiff's psychiatric problems is triggered, "[t]he presence of a mental disorder should be documented primarily on the basis of reports from individual providers, such as hospitals and clinics. Adequate descriptions of functional limitations must be obtained from these or other sources which may include programs and facilities where the individual has been observed over a considerable period of time." *Batista*, 972 F. Supp. at 218 (citing 20 C.F.R. Pt. 404, Subpt. P, App. 1, 12.00(D) (1997)).

Plaintiff contends that his psychiatric history was not properly developed in the record. In rendering its decision on Ortiz's disability claim, ALJ Vecchio was tasked with obtaining Ortiz's treatment records for the period at issue, i.e., from the filing date of Plaintiff's SSI application on October 3, 2013 to the date on which the ALJ issued its decision, May 19, 2015. In making that decision, the ALJ considered the following medical records: an assessment from consultative physician Dr. Woods dated November 7, 2013; an

26

assessment from consultative psychologist Dr. Fujiwaki dated
November 7, 2013; a review of the evidence of record by state
agency psychological consultant Dr. Harding dated November 20,
2013; testimony by psychiatric expert Dr. Halperin dated
February 20, 2015; and an assessment by SW Racz dated February
2015. These records do not contain the mental health treatment
records pertaining to the period from March 2014 through July
2016 wherein Ortiz commenced psychiatric and psychological
treatment at MHC with Dr. Leon and Dr. Kotlier, and continued
mental health treatment with SW Racz (the "Later Records").

Plaintiff argues that in failing to consider the Later
Records, which are relevant mental health records relating to
the time period at issue, the ALJ did not satisfy his
"obligation to develop the record" prior to rendering a
disability determination. *See Shaw*, 221 F.3d at 131. Further,
Plaintiff asserts that it is not sufficient that the Later
Records were submitted to the Appeals Council because the
Appeals Council applied an incorrect standard of review in
considering this new evidence.

The Commissioner argues that the ALJ properly
developed the Administrative Record in accordance with the
requirements as laid out in 20 C.F.R. § 416.912(b), because the

27

Commissioner's affirmative duty extended only to the point of considering medical source evidence for "at least the 12 months preceding the month" in which the SSI application was filed, and the ALJ did just this. *See* 20 C.F.R. § 416.912(b).

Here, in making its disability determination, the ALJ was aware that Plaintiff's psychiatric issues formed a primary focus of the inquiry simply by nature of the majority of the record evidence. The record evidence the ALJ did consider included numerous references to Plaintiff's problems with extreme social discomfort, depressed mood, feelings of isolation, and inhibited speech since childhood. *See* Tr. 124, 129 (Plaintiff testified that he feels very uncomfortable being around others); Tr. 384 (Dr. Fujiwaki evaluated that Plaintiff's manner of relating, social skills, and overall presentation were poor); Tr. 402 (SW Racz observed that Plaintiff exhibited marked difficulties in social functioning, noting particularly difficulties in communicating clearly and effectively, displaying awareness of the feelings of others, exhibiting social maturity, establishing interpersonal relationship, and interacting and actively participating in group activities); Tr. 135-36 (Dr. Halperin described Plaintiff as a "pseudo-retarded" individual, and identified Plaintiff's isolation and extraordinary passivity as a style of interacting "one would not

28

expect of a 31 year old or even a 21 year old or even an 11 year old."). Accordingly, the ALJ was on notice of Plaintiff's psychological limitations, and had a duty to develop the psychiatric evidence "primarily on the basis of reports from individual providers" from sourcing including "programs and facilities where the individual has been observed over a considerable period of time." *See Batista*, 972 F. Supp. at 218. The Later Records constitute just the type of appropriate psychiatric evidence satisfying this requirement, so the ALJ had an affirmative duty to consider this additional psychiatric evidence.

Moreover, the Commissioner's statement as to what the ALJ's duty to develop the record consists of is incomplete. While the Commissioner is correct in noting that the ALJ has an affirmative duty to consider medical source evidence for "at least the 12 months preceding the month" in which the SSI application was filed, *see* 20 C.F.R. § 416.912(b), the ALJ's duty in certain circumstances extends beyond this. Specifically, where, as here, the ALJ is made aware of a plaintiff's psychological problems, his duty to consider further psychiatric evidence covering "a considerable period of time" is triggered. *See Batista*, 972 F. Supp. at 218 (citing *Pascual*, 715 F. Supp. at 1271). By not taking such action here, the ALJ failed to

fulfill his duty in this regard, and Plaintiff's motion for judgment on the pleadings is granted.[6] This action is remanded to the ALJ for the purpose of fully developing the Administrative Record in line with this opinion. Moreover, the ALJ is ordered to reconsider his RFC determination in light of the fully developed Administrative Record.

---

[6]      This disposition obviates the need to reach Ortiz's claims that the ALJ failed to properly weigh the medical source opinion evidence; evaluate Plaintiff's symptoms in the way prescribed by the regulations; and reach a RFC determination supported by substantial evidence.

## V.    Conclusion

For the foregoing reasons, Plaintiff's motion is granted, and the Commissioner's cross-motion is denied. This action is remanded to the ALJ for the purpose of further developing the Administrative Record in the aforementioned ways.

It is so ordered.

**New York, NY**
**July 10, 2018**

ROBERT W. SWEET
U.S.D.J.

31